

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

Stanley Lee Moultrie,

                Plaintiff,

vs.

Director William Byars, Jr., South Carolina Department of Corrections Director; Bryan P. Stirling; Governor Nikki Haley; Attorney General Alan Wilson; Deputy Director Robert Ward; S.C.D.C. General Counsel Dayne Haile; Christopher Florian; Ann Hallman, Agency Grievance Coordinator; Maria Leggins, Agency Mailroom Coordinator; Willie Eagleton, Evan Warden; Associate Warden McFadden; Major C. West; Bethea Lt. Michael Toms; Ms. Baker, Mailroom Coordinator; Ms. Graves, ECI Grievance Coordinator; Pamela McDowell, Mailroom Supervisor; Lt. James Martin; Sgt. H. Sims; Associate Warden Bush, Lee CI; Associate Warden Nolan; Associate Warden Dean; K. Rivers, Lee CI Grievance Coordinator; Jimmy Sleigh; Deputy Warden; Lt. Jack Brown; Ms. Conyers, Lee CI Officer; General Counsel Tatarsky; Deputy Director McCall, Amy Smith, D. Eastridge, Felicia McQueen, Sandra Bowie, Deputy Warden Davis, Captain Mr. Thomas and Ms. Wilson,

                Defendants.

) C/A No.  9:14-1690-DCN-BM
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**REPORT AND
RECOMMENDATION**

---

      This action was originally filed by the Plaintiff, <u>pro se</u>, in the South Carolina Court of Common Pleas, asserting various claims against various Defendants.  Plaintiff is an inmate with the South Carolina Department of Corrections (SCDC).  This case was removed to this United States District Court by some of the Defendants on April 28, 2014.[1]

---

    [1]While the notice of removal indicated that it was filed on behalf of all Defendants, the Court
(continued...)



Although Plaintiff's original Complaint is drafted in a convoluted and rambling manner, by Order of the Court filed May 6, 2014, the Court determined (granting Plaintiff's pleading the liberal construction to which he is entitled as a *pro se* litigant) that Plaintiff has asserted claims for interference with his prison mail in violation of the First Amendment in Paragraphs 6, 11, 14, and 58; unconstitutional excessive use of force in Paragraphs 9, 18, 32 and 38; unconstitutional conditions of confinement in Paragraphs 10, 16, 26, 27, 28, 30, 38, 43-45, 50, 67, 69 and 70; unconstitutional interference with his right of access to the courts in Paragraphs 2, 6, 9, 11, 15, 39, 48, 56-57, and 60; and unconstitutionally inadequate medical care in Paragraphs 19, 20, 29, 33-34, 51 and 68.[2] Plaintiff also originally asserted his excessive force claim as a state assault and battery tort, and alleged that the Defendants are guilty of negligence with respect to various of his claims, also a state tort. However, as part of a motion to amend filed by the Plaintiff (Court Docket No. 46), Plaintiff abandoned his state tort law causes of action.[3] Therefore, the only claims Plaintiff is asserting in this

---

[1](...continued)
was subsequently notified that counsel who filed the removal did not represent all of the Defendants in this case. See Court Docket No. 15.

[2]That Order also pointed out that a significant number of Plaintiff's paragraphs deal with Plaintiff's complaints concerning the prison grievance procedure and how his grievances have been handled, but that those paragraphs do not set forth a viable claim. See Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) [existence of a prison grievance procedure does not confer any substantive right upon inmates]; Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991); Brown v. Dodson, 863 F.Supp. 284 (W.D.Va. 1994) [inmates do not have a constitutionally protected right to a grievance procedure]; Azeez v. DeRobertis, 568 F.Supp. 8, 10 (N.D.Ill. 1982) [even where a state elects to provide a grievance mechanism, violations of its procedures do not deprive prisoners of federal constitutional rights]; Burnside v. Moser, 138 Fed.Appx. 414, 415-416 (3d Cir. June 30, 2005). Therefore, Plaintiff was placed on notice that any claims contained in the Complaint relating to the prison grievance procedure would be dismissed at summary judgment.

[3]Plaintiff also added some additional Defendants as part of that motion to amend. See also, Court Docket No. 55.

lawsuit are his federal constitutional claims as are set forth hereinabove. See Order filed September 12, 2014 (Court Docket No. 55), p. 4, n. 5.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P, on April 2, 2015. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on April 6, 2015, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. Plaintiff thereafter filed a response in opposition to the Defendants' motion on June 9, 2015, which included a fifty-four page brief together with one hundred and sixty pages of supporting documents.[4] The Defendants' motion is now before the Court for disposition.[5]

## Background and Evidence

At the time Plaintiff filed this lawsuit, he was incarcerated at the Lee Correctional Institution (LCI), part of the SCDC prison system. As established and set forth in the Court's Order of September 12, 2014, Plaintiff is asserting, in general, five violations of this constitutional rights.

In ¶¶ 6, 11, 14 and 58 of the Complaint, Plaintiff asserts claims for interference with his prison mail in violation of the First Amendment. Specifically, Plaintiff alleges that on November 1, 2011, the Defendant Pamela McDowell (Mail Supervisor at the Evans Correctional Institution

---

[4]To the extent Plaintiff attempts to raise any new issues or claims in his response brief that are not part of the previously established claims in this case and which have been addressed by the Defendants in their motion, they are not properly before this Court and have therefore not been considered. See also, Order (Court Docket No. 73) [Text Order].

[5]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.



(ECI), where Plaintiff was then housed) sent Plaintiff a notice of rejection of some legal correspondence he had addressed to the South Carolina Attorney General's Office, because he had not put his room cell number on the return address. Plaintiff alleges that the Defendant Sgt. Sims "slid the mail under the Plaintiff's cell door" and told Plaintiff the reason it had been returned. Plaintiff alleges that after he examined the mail, he discovered a "centimeter precision cut" on the back of the envelope that had been taped over with a clear adhesive transparent tape, but that when he showed Sims the envelope, Sims stated he had no idea how that had happened but that he would do an incident report. Plaintiff alleges that he "believes" that the Defendant Warden Eagleton ordered the Defendant McDowell to open Plaintiff's legal mail and read the contents.

Plaintiff further alleges that McDowell violated his constitutional rights (as well as SCDC Policy/Procedure) when she intercepted a ninety page jailhouse lawyer manual that had been sent to him by the National Lawyers Guild of New York. Plaintiff alleges that other inmates had received this manual while on "security management", but that the Defendants "open[ed] his legal mail" and told Plaintiff that he would not receive this material. Plaintiff alleges that he wrote a complaint to the Defendant William Byars (SCDC Director) about this incident.

Plaintiff also alleges that "prison officials" withheld "indigent envelopes" given to him to write his family for "two entire months [January and February 2012]". Finally, Plaintiff alleges that prison officials were not only "stealing mail", but they were "illegally charging prisoners' account[s] when no postage was needed for the inter-departmental mail". See Complaint, ¶ ¶ 6, 11, 14, 58.

In ¶ ¶ 9, 18, 32 and 38 of the Complaint, Plaintiff alleges that he was subjected to unconstitutional excessive use of force. Specifically, Plaintiff alleges that on December 21, 2011,

4

he was asleep in his cell when he awoke to see members of the "rapid response team", consisting of the Defendant Lt. Martin, someone named "Harper", and another unnamed officer. Plaintiff alleges that he was told to "strip naked and be placed in belly and handcuff[s]" and told to sit down beside his cell mate. Plaintiff alleges that he complied with these instructions. Plaintiff alleges that the officers then began "tossing his legal work and court document[s]" all over the cell (presumably as part of a cell search), and that when Plaintiff told them not to throw his legal documents away or ruin them, Martin cursed at him and told him to shut up. Plaintiff alleges that he and Martin then got into a "heated argument", following which Martin instructed the other officer to put Plaintiff in the "crisis intervention cell". Plaintiff alleges that even though he was compliant, Martin "assault[ed]" him and sprayed him in the genital area with pepper spray before cursing at him again. Plaintiff alleges that in addition to being excessive force, this conduct also violated SCDC policy. Plaintiff alleges that the chemical agent "sabre red" (the agent Martin allegedly used) is designed to burn and irritate the skin, but that he was "not allowe[ed] . . . to shower for days at a time because they claim the prisoner can use the sink to wash". Plaintiff alleges that he "has chemical burns around his neck, chest and stomach . . . .".

Plaintiff also alleges that an Officer Quick[6] began referring to him as a "snitch" because he was filing grievances, and that on the evening of September 12, 2014[7] Quick opened the "food pass" flap on the cell door while Plaintiff and his cell mate were sitting down eating, and

---

[6]In the Court's Order of September 12, 2014, the undersigned noted that Quick had not been named as a party Defendant in the caption of Plaintiff 's Complaint. See also, Court Docket No. 1-1, p. 4. Quick has also never been served with process in this case.

[7]This is apparently a scrivener's error, as this date is several months after Plaintiff signed and filed the Complaint containing this allegation. Quick attests in an affidavit filed with the Court that this incident occurred on September 15, 2012.



"sprayed [an] entire can of chemical sabre red pepper spray into [the] cell", then stating "that's for what you said about my daughter". Plaintiff alleges that Quick thereafter "fabricated the Incident Report to justify the use of force", and that neither he or his room mate "were given a shower until two days later". Plaintiff also alleges that Quick's actions violated the SCDC Use of Force Policy, and that he was "barred" from disclosing the statements of witnesses at a later disciplinary hearing (apparently relating to his incident).

Plaintiff further alleges that on March 28, 2012, Martin was opening the "food pass entrance" while handing out food in the SMU.[8] Plaintiff alleges that when Martin reached his food service flap, Plaintiff inquired about a Request to Staff Form he had sent to the commissary concerning underwear, at which time Martin "angrily" slammed Plaintiff's right pinky finger in the flap. Plaintiff alleges that he screamed in pain and fell on the floor, while his room mate yelled to the officer that Plaintiff needed a nurse. Plaintiff alleges that "Sgt. Manning" came to his cell but told Plaintiff he was not doing anything to help him.[9] See Complaint, ¶ ¶ 9, 18, 32, 38.

In ¶ ¶ 10, 16, 26, 27, 28, 30, 38, 43-45, 50, 67, 69 and 70 of the Complaint, Plaintiff alleges that he has been subjected to various unconstitutional conditions of confinement, some of which also touch on various actions by prison officials which may relate to other claims. Plaintiff alleges that he contracted a severe eye infection due to the fact that he was not given disinfectant to clean his cell, that the prisoners in the SMU are allowed to shower only three days out of seven, and that his cell at LCI was "filthy" and a "breeding ground for bacteria, and germs and microbes", and "had no mechanism to hang face towels and cloth". Plaintiff alleges that on April 17, 2012 the

---

[8]Special Management Unit.

[9]Manning is not a named Defendant in this lawsuit.

Defendant Sgt. Sims made him take down a "cloth line" Plaintiff had made to hang his laundry after Plaintiff had washed his clothes in the toilet, and that Sims "denied the Plaintiff recreation", resulting in Plaintiff and Sims getting into a "verbal altercation" over recreation policy. Plaintiff then alleges that the following day, April 18, 2012, while he was being escorted to the shower in handcuffs and belly chains, another inmate "started stabbing and beating the Plaintiff" and had to be wrestled down by an Officer named Kesslar. Plaintiff further alleges that when the Defendant Sims and Officer Quick arrived, Sgt. Sims "power drive" him to the concrete floor, slamming him on his face, busting his lip and nose, and knocking him unconscious. Plaintiff alleges he sustained a concussion, punctures, lacerations, and "severe swelling" on his head, neck, back and face because of this incident, but that "Nurse Perry"[10] helped the Defendants Eagleton, Martin and Sims "cover up the incident", which was the fault of the Defendants because they "failed to see the foreseeability of the broken security locking mechanism". Plaintiff alleges that the Defendants Eagleton (Warden at ECI) and Ward (Deputy Director) both had knowledge of Plaintiff's prior complaints about the broken security doors and had failed to take any corrective action. Plaintiff further alleges that the Defendant Martin knew about these problems, and even stated several days after the incident (April 23, 2012), that Plaintiff's complaints were not going to "change anything". Plaintiff also alleges that the Defendant Haley (Governor of South Carolina) and Wilson (Attorney General) knew about his "broken door complaint".

Plaintiff also alleges that the Defendant Eagleton intentionally housed him with dangerous inmates, including Charles Hayes, and that on December 6, 2012 another inmate (Clinton McCall) gave Hayes orders to attack the Plaintiff, which Hayes did that night, knocking him

---

[10]Nurse Perry is not a named Defendant in this lawsuit.

unconscious and sexually assaulting him. Plaintiff alleges that he sustained several injuries during this assault, but that all he can remember is "Nurse Martin" taking pictures of him after the event. Plaintiff also alleges that Hayes was able to steal some of his envelopes and property, and that "officials" ordered a "Sgt. Sanderson" to destroy evidence of the incident while the Defendants Sims and Martin later teased Plaintiff about it. Plaintiff alleges that he filed a grievance over officials disregarding his safety and the fact that McCall and Hayes remained housed in the same dorm as the Plaintiff, and that on March 11, 2013 he had to pay money to these prisoners to keep them from stabbing him.

Plaintiff alleges that the Defendant Bush (Associate Warden at LCI), misplaced his dictionary and "mental health treatment books", and placed him in a dorm unit where there were no lockers or storage space, tables to write on, safety mechanisms, or climbing ladder for the bunk bed. Plaintiff further alleges that the cells on his cell block at LCI violated "building codes" and DEHC regulations, that his cell block at LCI was dangerous and had a long history of stabbings and drug trafficking as well as smuggling of contraband. Plaintiff alleges that the Defendant Associate Warden Nolan is "too lazy and not diligent to address the primary security concerns at [LCI]". Plaintiff alleges that on March 17, 2014 he went to the Defendants Bush, Nolan and Dorm Lt. Brown (along with a Major Stephen, who is not a named Defendant) and told them he needed to be moved due to the noise level and dangerousness of his cell assignment, but that instead of being moved, the Defendant Brown had him sent to lockup. Plaintiff alleges he was told to strip down to his boxers, that it was cold in his cell, and that following his release his legal box had been ripped and his property stolen. See Complaint, ¶ ¶ 10, 26, 27, 28, 30, 38, 43-45, 50, 67, 69 and 70.



8

In ¶¶ 2, 6, 9, 11, 15, 39, 48, 56-57, and 60 of the Complaint, Plaintiff alleges unconstitutional interference with his right of access to the courts. Plaintiff alleges that after he arrived at ECI on August 29, 2011, he began filing informal administrative complaints against the Defendants McDowell (Mail Room Supervisor) and McFadden (Associate Warden) because McDowell was refusing to notarize and authenticate Plaintiff's proof of service for his "federal case", and that the Defendant Eagleton (Warden) abused his discretion by not allowing Plaintiff to use large brown manilla envelopes to mail out his legal documents, even though SCDC policy allows him to receive large brown manilla envelopes to use for "legal purposes", with the funds to be debited from his account. Plaintiff alleges that he was told that inmates in the SMU could not be given brown manilla envelopes, even though he was provided large brown manilla envelopes when he was in the SMU at the Allendale Correctional Institution, and that he "literally" had to stuff over fifty pages of a legal petition into two regular sized envelopes.

Plaintiff also makes allegations about the rejection of his legal correspondence by McDowell and his failure to receive the jail house lawyer manual that had been sent to him (previously discussed hereinabove), and that he had to establish a "four-digit log number tracking system" to keep track of his mail because prison officials were taking or intercepting so much of his correspondence. Plaintiff alleges that on August 20, 2012 the Defendant ECI Mail Room Clerk Baker received legal documents addressed to the Plaintiff from his defense attorney, but that "prison officials" withheld these documents and intentionally destroyed them. Plaintiff further alleges that on December 5, 2012 he had mailed out a petition of appealability concerning a civil action and complaint, but that the "courts never received the petitions", and that it was not until after he wrote the South Carolina Court Administration and received a response that he realized his mail had been

9

"obstructed" at ECI. Plaintiff further alleges that he has "reason[ ] to believe", after "three more legal court petition[s] . . . vanished again", that top state officials with the Department of Corrections were orchestrating and participating in a scheme to obstruct Plaintiff's "passage of mail". Plaintiff states that he "believes" this was occurring because on April 8, 2012, after he had been transferred to LCI, he went to the mail window operated by the Defendants Wilson and Eastridge and handed them a civil lawsuit addressed to various court and legal officials (including the Office of General Counsel of the SCDC), and Eastridge told him that postage was not needed for interagency or departmental mail, even though he had been charged for postage for his interagency or departmental mail when he was at ECI. Plaintiff alleges that Eastridge thereafter began denying him postage to send mail to his defense counsel and in some instances became uncooperative with the Clerk of Court's Office in Beaufort County when the Clerk asked Eastridge what type of case information she needed. Plaintiff alleges that he has a letter wherein his defense counsel had requested the Defendant Dean (Associate Warden) to allow Plaintiff to send his mail out. See Complaint, ¶ ¶ 2, 6, 9, 11, 15, 39, 48, 56-57, 60.

Finally, in ¶ ¶ 18-20, 29, 33-34, 51 and 68 of the Complaint, Plaintiff asserts claims for violation of his constitutional right to adequate medical care. Plaintiff alleges that after the incident on March 28, 2012, where the Defendant Martin slammed his pinky finger in the cell door flap, he experienced intense pain and throbbing over the next seventy-two hours, but that he was not given any pain medication "because the staff claimed they were out". Plaintiff alleges he showed his swollen finger to the Defendant Nurse McQueen as well as to two other nurses ("Stokes" and another name which is unintelligible), but that they told him there was nothing they could do and for Plaintiff to sign up for sick call. Plaintiff complains that these nurses were uncooperative, did not even give him Tylenol, and improperly denied him emergency health care. Plaintiff alleges that the next day

10

he showed his finger to a "Nurse Tyler", who saw that it was "swollen pretty bad" and told the Defendant Sgt. Sims to bring Plaintiff to medical, but that Sims "ignored the nurse".

Plaintiff also alleges that after the incident on April 18, 2012 when he was assaulted by another inmate, and following which he was seen by "Nurse Perry", he was thereafter "not given daily dressing change[s] for his wounds and that each day he had to use tissue to stop the draining fluids leaking down his neck". Plaintiff further alleges that when he went to sleep a day after this incident, when he awoke there were "puss stains" on his pillow case.

Plaintiff also alleges that he has a mental health condition but that the "mental health doctor" improperly terminated his mental health medication, with a "Ms. Deleney" telling him that she saw no need to continue his medicine.[11] Plaintiff alleges that ECI "has a history of abusing mental health inmates and using corporal punishment", and that after prison officials terminated his "anti-psychotic medication", his behavior worsened and he became unable to control his behavior. Plaintiff further alleges that with respect to his claim that his eye became infected, causing his "eye and nose [to bleed] off and on for six days", Quick and the Defendant Nurse McQueen refused to take him to medical. Plaintiff also alleges that prison officials "conspired with his mental health counselor" to downgrade his mental health so as to keep him inside the "Chesterfield Unit", where the Defendant Lt. Brown "yells at him as if he is a drill sergeant". Plaintiff alleges that he is often sleepy because of his mental health medication, which causes Brown to scream at him and lock him in his cell because Plaintiff refuses to "march" to eat. See Complaint, ¶ ¶ 18-20, 29, 33-34, 51, 68.

Plaintiff seeks monetary damages, as well as certain injunctive and/or declaratory relief. See generally, Plaintiff's Complaint.

---

[11]Deleney is not a named Defendant in this lawsuit.



11

In support of summary judgment in this case, the Defendant Maria Leggins has provided an affidavit wherein she attests that she is currently the Executive Assistant to the Director, but that she formerly held the position of Agency Mail Room Coordinator. With respect to Plaintiff's allegation that the Defendant McDowell wrongfully intercepted a jailhouse lawyer manual,[12] Leggins attests that it is "undisputed" that Plaintiff is not permitted to receive certain publications or correspondence because of his classification in the SMU, and that these restrictions apply to all SMU inmates as a means to protect public safety, institutional order, and security. Leggins attests that prison mail is processed in accordance with SCDC Policy PS-10.08, which provides that inmates housed in the SMU are not permitted to receive publications such as the jailhouse lawyer manuals of which Plaintiff complains. Leggins attests that this policy acts as a deterrent to receipt of contraband, and also encourages inmates to avoid placement in the SMU. Even so, Plaintiff remains able to request materials through the prison library, he is able to request three books at a time from the library, and he also had access to legal materials as well as to the West Law program for research. With respect to Plaintiff's allegation about someone cutting open his mail, withdrawing his indigent envelopes, and that someone was illegally charging prisoners for postage, Leggins attests that she never engaged in such conduct. See generally, Leggins Affidavit.

The Defendant James Martin has submitted an affidavit wherein he attests that he was a Corrections Officer at ECI during the time period relevant to Plaintiff's allegations. Martin attests that Plaintiff is serving a ten year sentence for assault and battery of a high and aggravated nature and a five year sentence for criminal domestic violence of a high and aggravated nature, and that Plaintiff has had numerous institutional disciplinary actions since his incarceration. Martin has attached as

---

[12]Leggins attests that McDowell is now retired.

Exhibit A to his affidavit an Inmate Search Detail Report verifying this information. Martin has also attached as Exhibit B to his affidavit a copy of the Incident Report from December 21, 2011, relating to the use of force against the Plaintiff on that day. Martin attests that on that day, during a search of Plaintiff's cell, he was told to remain seated on the floor but that he refused and began making verbal threats, including that he had "something for" the correctional officers (using a derogatory term). Martin attests that he gave Plaintiff several directives to cease his actions, but that Plaintiff refused, following which he administered one burst of saber red fogger into the cell in a good faith effort to reasonably maintain and/or restore discipline and to get Plaintiff to comply with his commands. Martin attests that Plaintiff then complied and ceased his "impermissible actions", following which Plaintiff was thereafter promptly seen by Nurse McRae. Martin also attests that when Plaintiff complained to McRae of skin burning on the right side and requested a shower, Plaintiff was given permission to take a shower. Martin has attached as Exhibit C to his affidavit a copy of Plaintiff's medical record Encounter No. 117, which confirms that Plaintiff was in no respiratory distress, and was experiencing no rash, hives, or scratching as a result of this incident. Martin attests that the quantity of chemical munitions that was utilized during this incident was commensurate with the gravity of the occasion,[13] with a limited application of chemical munitions in this case being much more humane and effective than a flesh to flesh confrontation with the Plaintiff. Martin denies any additional instances of excessive force alleged by the Plaintiff, and attests that at no time did either he or any other named Defendant knowingly violate any of Plaintiff's civil or constitutional rights. See generally, Martin Affidavit, with attached Exhibits.

_____

[13]The exhibits attached to Martin's affidavit indicate that 34.4 grams of fogger was used. See Exhibit (Court Docket No. 113-4, p. 9).



Officer Dla Quanta Quick has provided an affidavit wherein he attests that he was a correctional officer at ECI during the time period relevant to Plaintiff's allegations. Quick attests to the same conviction and disciplinary history for the Plaintiff as was attested to by Martin. With respect to the incident set forth in the Complaint from September 15, 2012, Quick attests that on date he gave Plaintiff several directives to move away from his cell's food flap, but that Plaintiff refused, stating that he was not moving away from the food flap until he was served with another tray that was hot. Quick attests that he told Plaintiff to let him get the other tray back and that he would give Plaintiff another, but that Plaintiff still refused, cursing at Quick. Quick attests that he then administered a single, small burst of saber red chemical munitions to gain Plaintiff's compliance, following which Plaintiff "ceased his impermissible actions". Quick attests that the quantity of chemical munitions used was commensurate with the gravity of the occasion, was much more humane and effective than a flesh to flesh confrontation with the Plaintiff would have been, and that the munitions used were not used maliciously and sadistically to cause harm to the Plaintiff. Quick has attached as Exhibit B to his affidavit a a copy of the Incident Report relating to this incident.

Quick attests that Plaintiff was thereafter promptly seen by the Defendant Nurse McQueen, but that when Plaintiff was asked by McQueen if he was alright, he "continued hollering and punching the cell door". Nonetheless, Quick attests that Plaintiff was walking and talking, his eyes were wide open, and there were no significant injuries noted (since none existed). As further evidence that no constitutional violation occurred during this incident, Quick has attached to his affidavit at Exhibit C a copy of Plaintiff's medical record Encounter No. 156 relating to his incident, which reflects that Plaintiff was walking and talking with his eyes wide open, and that McQueen instructed Plaintiff that he should wash his eyes as needed. Quick also attests that Plaintiff was



14

charged with and found guilty of refusing or failing to obey orders as a result of this incident. See also attached Exhibit D to the Affidavit. See generally, Quick Affidavit, with attached Exhibits.

The Defendant Willie Eagleton has submitted an affidavit wherein he attests that he is the Warden at ECI, that during the time period relevant to Plaintiff's complaint neither he or any other of the Defendants were deliberately indifferent to any of Plaintiff's constitutionally required needs or rights, and that he performed the discretionary functions of his official duties in an objectively reasonable fashion. See generally, Eagleton Affidavit.

The Defendants have also submitted an affidavit from David Martinez, who attests that he is an Inmate Grievance Administrator. Martinez attests that he has reviewed Plaintiff's Inmate Grievance Records, and that between April 2, 2013 and July 25, 2014, Plaintiff filed 32 grievances while incarcerated at LCI. Further, between November 10, 2011 and March 10, 2013, Plaintiff filed 70 grievances during his period of incarceration at ECI. Martinez attests that pursuant to SCDC Policy, an inmate seeking to complain of prison conditions must first attempt to formally resolve his complaint. If that attempt fails, the inmate is then required to file a Step 1 Grievance with designated prison staff. If the Step 1 Grievance is denied, the inmate may then appeal to the Regional Director via the filing of a Step 2 grievance. Thereafter, a review from the South Carolina Administrative Law Court (ALC) is also generally a part of the available administrative remedies an inmate must exhaust. Martinez attests that Plaintiff has not filed an appeal to the ALC concerning any matters now complained of against any named Defendant, and that Plaintiff has therefore not exhausted his administrative remedies as required. See generally, Martinez Affidavit.

Finally, the Defendants have provided voluminous copies of Plaintiff's SCDC Health Services Medical Summary Records from the relevant time period, totaling eighty pages of records.



15

As noted, Plaintiff has provided one hundred sixty pages of exhibits as attachments to his memorandum opposing summary judgment.  These exhibits include copies of Incident Reports, Requests to Staff Members, Grievances, and medical records, many of which are duplicative to those placed into evidence by the Defendants.  Although most of Plaintiff's exhibits do not constitute "evidence" to support the allegations of his complaint,[14] the undersigned has listed hereinbelow some exhibits which are relevant to Plaintiff's claims, and has also further discussed many of Plaintiff's exhibits as part of the analysis of Plaintiff's claims, <u>infra</u>.

A medical summary report from April 3, 2012 reflects that Plaintiff complained that his finger had been slammed in a flap and was painful.  It was noted to be very swollen, especially at the joint, and that Plaintiff was to be provided with some Motrin and an x-ray obtained.  With respect to the x-ray, it found "no evidence of osseous injury".  This medical summary report also includes an entry from April 18, 2012 relating to an injury to the back of Plaintiff's head after another inmate had struck him; it was noted that Plaintiff had an approximate three centimeter cut on the back of his head for which he was offered steri strips, but that Plaintiff asked if he could just have a band-aid instead.  <u>See</u> Plaintiff's Exhibit F-9.  <u>See also</u> Plaintiff's Exhibit F-12 (x-ray results).

Plaintiff has also submitted an affidavit from Inmate Kawon Scarborough, who attests that on September 15, 2012 he was in his cell when Officer Quick and others were serving dinner. Scarborough attests that he heard Officer Quick yell out to the Plaintiff (whose cell was down the

---

[14]For example, while Plaintiff's grievances and Request to Staff Member forms reflect Plaintiff's dissatisfaction with various matters relating to his incarceration, they are not themselves "evidence" that any of the incidents or events he describes therein occurred as he claims.  <u>Cf</u>. <u>Ball v. LeBlanc</u>, _____ F.3d _____, 2015 WL 4114473 at * 6 (5th Cir. July 8, 2015) ["Because grievances are essentially pleadings, not evidence, they must have independent verification before they become probative."]; <u>Alexander v. Forr</u>, 297 Fed.Appx. 102, 105 n. 3 (3d Cir. Aug. 28, 2008) ["It goes without saying that prison grievances are not evidence of the allegations they contain."].

16



hall), "I told you I was going to get you for talking bout my daughter" and proceeded to spray chemical pepper spray into Plaintiff's food flap. Scarborough attests that he then watched as Officer Quick walked downstairs and gave Officer "Kessler" a high five. See Plaintiff's Exhibit F-19.

Plaintiff has also submitted an affidavit from Inmate Timotheus Hemingway, who attests that he has been in the SMU at ECI since 2010, and that he has witnessed several inmates tampering with locked cell doors in order to "come out with sole intentions of causing harm to other inmates . . . .". Hemingway also attests that he has witnessed inmates come out of cells with knives and stab other inmates who are in restraints. See generally, Hemingway Affidavit, (Plaintiff's Exhibit F-37).

Plaintiff has also submitted an affidavit from Inmate Preston Mullinax who attests that he is has been in the SMU at ECI since October 3, 2011, and that he has witnessed numerous inmates come out of broken lock doors to "stab, beat, even roam the dorm at night unsupervised". Mullinax attests that on April 18, 2012, Plaintiff was "attacked viciously while being escorted to shower by an inmate and was taken to medical where he was treated for wounds". See generally, Mullinax Affidavit, (Plaintiff's Exhibit F-38).

Plaintiff has also himself submitted an affidavit, in which he attests that he received his rejected outgoing legal correspondence with a tape incision on November 1, 2011, that his correspondence from the New York Lawyer Guild was intercepted by prison officials on December 5, 2011, that on December 21, 2011 he was "gassed" with chemicals for making a verbal threat to file a grievance (during which time he was also not receiving his prescribed dosage of mental health medication), that he has witnessed inmates come out of their solitary confinement cells in the SMU during the night hours to organize gang fights, that on March 28, 2012 the Defendant Martin did slam

17

his finger in the food pass flap, following which he was denied adequate medical care by both Martin and the Defendant Nurse McQueen even though his finger was "and still is" dislocated.

Plaintiff also attests that on April 18, 2012 he was attacked and stabbed in the head by Inmate Quenton McCall after he "breached a broken cell door", even though prison officials had knowledge that inmates were breaking out of the Maximum Security cell doors and following which he did not receive adequate treatment; that the Defendant Eagleton and his staff were not giving him indigent envelopes to write home with; that on August 20, 2012 the Defendant Baker did remove a pre-trial legal petition addressed to him from his lawyer and obstructed his legal mail from going out; and that on July 26, 2012 the Defendant Sims forced him into a cell with Inmate Frederick Green even after Green had told Sims not to open the door to let him in, resulting in he and Green getting into a fight and being gassed.

Plaintiff further attests that on September 12, 2012 Quick "unconstitutionally" gassed him in retaliation for a comment he claimed Plaintiff made against his daughter, following which he filed a "falsified" incident report; that in November 2012 he filed a civil action against the Defendant Haley and several state officials about unconstitutional conditions at ECI; that in October (year not provided) a "Mr. Parker's" money was stolen after an inmate broke out of his cell; that on November 18, 2012 Inmate Quentin McCall was stabbed by an inmate who had broken out of his security door; that the Defendants Eastridge and Martin did put Inmate Charles Hayes in Plaintiff's cell after he had been brought to lockup for inciting a gang riot; and that on December 6, 2012 Hayes attacked the Plaintiff, sexually assaulted him and destroyed Plaintiff's property.

Plaintiff alleges that on December 6, 2012 he sent out a legal petition to the South Carolina Court of Appeals; that in January 2013, the Defendant Sims placed him in a holding cell



18

with two members of a gang who tried to "pick out" of their handcuffs and attack him; that on March 20, 2012 a group of gang members tried to break into his cell and threaten him to get Plaintiff to pay them a "green dot money card"; that on April 8, 2013 the Defendants Eastridge and Wilson "intercepted" his petition addressed to the Allendale Court of Common Pleas; that the Defendant LCI Grievance Coordinator Rivers did obstruct a criminal investigation along with the Defendants Leggins, Byars and McCall; that Eastridge has on several occasions obstructed mail addressed to the U. S. Attorney General's Office as Freedom of Information requests, telling Plaintiff that that is not "legal privileged mail"; that Plaintiff has filed several complaints with the U. S. Justice Department's Office of Civil Rights, the South Carolina Governor's Office, and the South Carolina Attorney General's Office; that inmates at LCI have "trace keys" to the institution security doors; and that Plaintiff witnessed a "gang member riot" on February 26, 2015 during which several officers were "stab[ed] up". See generally, Plaintiff's Affidavit, (Plaintiff's Exhibit F-58).

Plaintiff has also submitted a copy of a Request to Staff Member Form dated February 8, 2012, wherein he complains about not having received indigent envelopes for the months of January and February, bearing a response from Warden Eagleton stating that Plaintiff has "received envelopes from me for both of these months". See Plaintiff's Exhibit F-85.

Finally, Plaintiff has also provided the envelope he mailed to the Assistant Attorney General on or about November 1, 2011, which was returned to him with a notation on it that it was being returned to him and that "once you have put your info, as required, drop in box and we'll send out". See Plaintiff's Exhibit J-2.



## Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990).

Here, after careful review and consideration of the arguments and evidence presented, the undersigned concludes for the reasons set forth hereinbelow that the Defendants' are entitled to summary judgment in this case.

## I.

Initially, it is readily apparent from a review of the allegations of Plaintiff's Complaint (as set forth in the Court's Order of May 6, 2014), that Plaintiff has made no substantive allegations of wrongdoing whatsoever against the Defendants Stirling, Haile, Florian, Hallman, Leggins, West, Toms, Graves, Rivers, Sleigh, Conyers, Tatarsky, McCall, Smith, Bjowie, Davis, or Thomas. As



20

Plaintiff has failed to present any evidence, or to even set forth any factual allegations, to show that any of these Defendants violated his constitutional rights,[15] they are entitled to dismissal as party Defendants in this case.  See Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1999) ["Liability . . . must be based on the personal involvement of the Defendant"], cert. denied, 522 U.S. 1154 (1999); Wilson v. Cooper, 922 F.Supp. 1286, 1293 (N.D.Ill. 1996); see also Horton v. Marovich, 925 F.Supp. 540 (N.D.Ill. 1996) ["Thus, a plaintiff suing a government official in his individual capacity and therefore seeking to hold the official personally liable must show that the official personally caused or played a role in causing the depravation of a federal right"].

## II.

With respect to the remaining Defendants, one argument advanced for summary judgment is that Plaintiff failed to exhaust his administrative remedies prior to filing this lawsuit. Pursuant to 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section1983 of this Title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

However, it is the Defendants who have the burden of showing that Plaintiff failed to exhaust his administrative remedies; see Anderson v. XYZ Correctional Health Services, Inc., 407

---

[15]While Plaintiff does reference one or more of these individuals in other paragraphs of his Complaint and in his affidavit relating to how they may have handled his grievances, as previously noted, violations of prison grievance procedures (even assuming for purposes of summary judgment that any such violations in fact occurred) do not amount to a violation of a constitutional right.  See also, n. 2, supra.  Additionally, Plaintiff's allegations in his Complaint as well as his general and unsubstantiated allegations in the affidavit he filed in opposition to summary judgment that the named Defendants Rivers, Leggins, Byars and McCall "obstructed" a criminal investigation also fail to state a viable claim.  See Linda R. S. v. Richard D., 410 U.S. 614, 619 (1973) [A private citizen does not have a judicially cognizable interest in the prosecution or non-prosecution of another person]; Collins v. Palczewski, 841 F.Supp. 333, 340 (D.Nev. 1993) ["Long ago the courts of these United States established that 'criminal statutes cannot be enforced by civil actions'"]; cf. Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 767 n. 13 (2005).



F.3d 674, 683 (4th Cir. 2005) [inmate's failure to exhaust administrative remedies is an affirmative defense to be both pled and proven by the Defendant]; and the undersigned finds for the reasons set forth hereinbelow after review of the materials submitted that the Defendants are not entitled to dismissal of this case on this ground at this time.

Defendants argue that this case should be dismissed because Plaintiff did not appeal any of the denials of his grievances to the Administrative Law Court. While the undersigned can take judicial notice that the SCDC grievance procedure requires, inter alia, the filing of a Step 1 grievance by the inmate and, if that grievance is denied, the inmate must then appeal the denial by filing a Step 2 grievance; Aloe Creme Laboratories, Inc. v. Francine Co., 425 F.2d 1295, 1296 (5th Cir. 1970)[a federal court may take judicial notice of the contents of its own records]; see also Martin v. Miley, No. 13-3516, 2015 WL 1862829 at * 6 (D.S.C. Apr. 23, 2015); Branton v. Ozmint, No. 08-2306, 2009 WL 1457144 at * 2 (D.S.C. May 22, 2009); Jenkins v. South Carolina Dept. of Corrections, No. 05-2800, 2006 WL 1083563 at * 5 (D.S.C. Apr. 18, 2006); that is all that is required to exhaust a grievance at the prison level. Although Martinez attests in his affidavit that Plaintiff did not thereafter appeal any of these denials to the ALC, a Plaintiff is not required to appeal the denial of a Step 2 grievance to the Administrative Law Court in order to exhaust his administrative remedies as required by 42 § U.S.C. 1997e(a) for purposes of the claims being asserted in this lawsuit. See Johnson v. Ozmint, 567 F.Supp. 2d 806, 820, n.5 (D.S.C. 2008); Brown v. Doe, No. 12-927, 2015 WL 1297917 at * * 1, 6-8 (D.S.C. Mar. 23, 2015) [holding that § U.S.C. 1997e(a) does not require further appeal to Administrative Law Court]; Ford v. Ozmint, No. 13-1618, 2014 WL 2881621 at * 2 (D.S.C. June 25, 2014); Duncan v. Langestein, No. 07-268, 2008 WL 153975 at * 5 (D.S.C. Jan. 14, 2008) (citing Charles v. Ozmint, No. 05-2187, 2006 WL 1341267 at * 4 n. 4 (D.S.C. May 15,

2006) [recognizing that completion of Step 2 grievance exhausts administrative remedies and § 1997(a) does not require inmates to further appeal to Administrative Law Court.)]; Ayre v. Currie, No. 05-3410, 2007 WL 3232177 at * 7 n.5 (D.S.C. Oct. 31, 2007); Lowry v. Davis, No. 06-509, 2006 WL 3759828 at * 2 (D.S.C. Dec. 18, 2006)["It is not necessary for the inmate to file an appeal with the state ALJ Division for matters pertaining to prisoner's conditions of confinement."].

Therefore, the Defendants are not entitled to summary judgment in this case on this ground. Anderson, 408 F.3d at 683 [inmate's failure to exhaust administrative remedies is an affirmative defense to be both pled and proven by the Defendant].

### III.

Turning to the merits of Plaintiff's claims, as employees of the State of South Carolina, all of the remaining Defendants are subject to suit for damages under § 1983 in their individual capacities. However, although subject to suit, Plaintiff has failed to present sufficient evidence to create a genuine issue of fact as to whether the Defendants Byars, Haley, or Alan Wilson played any role in the events at issue. Rather, it is readily apparent that these individuals have all been named as party Defendants because of their administrative or supervisory roles in the Department of Corrections, the South Carolina Attorney General's Office, or the Executive Department of the State of South Carolina.

The doctrines of vicarious liability and respondeat superior are not applicable to § 1983 cases; Vinnedge v. Gibbs, 550 F.2d 926, 927-929 & nn. 1-2 (4th Cir. 1977); and therefore Plaintiff must have presented evidence to show that these Defendants had "personal knowledge of and involvement in the alleged depravation of [Plaintiff's] rights" in order to be liable. Harveck v. Smith, 814 F.Supp.2d 608, 627 (E.D.Va. 2011), citing Wright v. Collins, 766 F.2d 841, 850 (4th Cir.

23

1985).  Plaintiff has presented no evidence, and has not even alleged, that any of these three

Defendants were personally involved in any of the actions of which Plaintiff complains.  As such (as

supervisory officials), they may be held liable only in so far as they were responsible for an official

policy or custom which resulted in illegal action.  See generally,  Monell v. Dep't of Social Servs.,

436 U.S. 658, 694 (1978); Wetherington v. Phillips, 380 F.Supp. 426, 428-429 (E.D.N.C. 1974),

aff'd, 526 F.2d 591 (4th Cir. 1975); Joyner v. Abbott Laboratories, 674 F.Supp. 185, 191 (E.D.N.C.

1987); Stubb v. Hunter, 806 F.Supp. 81, 82-83 (D.S.C. 1992);  See Slakan v. Porter, 737 F.2d 368,

375-376 (4th Cir. 1984), cert. denied, Reed v. Slakan, 470 U.S. 1035 (1985); Shaw v. Stroud, 13 F.3d

791, 799 (4th Cir. 1994), cert. denied, 115 S.Ct. 67 (1994); Fisher v. Washington Metro Area Transit

Authority, 690 F.2d 1133, 1142-1143 (4th Cir. 1982) (citing Hall v. Tawney, 621 F.2d 607 (4th Cir.

1980)).

Other than, possibly, to the extent a prison "policy" restricting the types of materials

inmates housed in a prison SMU are entitled to possess could be attributed to the Defendant Byars,[16]

Plaintiff has presented no evidence to show that any such official policy or custom for which these

Defendants would be responsible resulted in a violation of his constitutional rights.  Therefore, these

three Defendants are entitled to dismissal as party Defendants in this case.

## IV.

With respect to Plaintiff's complaints concerning his mail, in order to proceed with

his claim that he has been denied access to the Courts, Plaintiff must have evidence to show that he

was prejudiced in a pending court proceeding because of improper conduct or actions by a named

Defendant.  Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987) ["Courts have required a showing

---

[16]This claim is discussed separately, infra, and found to be without merit.

24



by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"]; <u>Gee v. Pacheco</u>, 627 F.3d 1178, 1191 (10th Cir. 2010)["[A] prisoner must demonstrate actual injury from interference with his access to the courts - that is, that the prisoner was frustrated or impeded in his efforts to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement."].  Plaintiff has provided no probative evidence to show that the actions of any of the Defendants he references with respect to this claim prejudiced him in a pending legal case.

Specifically, Plaintiff has presented no evidence to show how the Defendant Eagleton allegedly denying him access to "large brown manilla envelopes" (an allegation for which Plaintiff has provided no evidentiary support) denied him access to the Courts - he even concedes in his Complaint that he instead simply "stuffed" his legal petition into two regular sized envelopes. Plaintiff has also provided no evidence to show that either McDowell or McFadden denied him access to the courts by allegedly refusing to notarize and authenticate his "proof of service" for a federal case (again, an allegation for which Plaintiff has provided no evidentiary support), nor has he provided any evidence to support the allegation in his Complaint that the Defendant Baker withheld legal documents addressed to him by a defense attorney, or that the Defendants "Ms. Wilson"[17] and/or Eastridge hindered his "passage of mail".

Looking at the actual evidence presented in this case, Leggins attests in her affidavit that Plaintiff was able to request materials through the prison library and even had access to legal materials as well as to the West Law program for research.  With respect to Plaintiff's exhibits, in a Request to Staff Member dated February 8, 2012 (Plaintiff's Exhibit F-84), Plaintiff complains to the

---

[17]A different "Wilson" than the Defendant Attorney General Alan Wilson.

25

Defendant Eagleton that he has not received indigent envelopes for the months of January and February and asks Eagleton to please make sure that he gets some envelopes so he can write his daughters. Defendant Eagleton responded to this Request to Staff form by writing: "[Plaintiff has] received envelopes from me for both of these months". Plaintiff's Exhibit F-98 is a Step 1 Inmate Grievance form where Plaintiff complains that he has been denied materials with which to exercise his right of access to the courts out of retaliation for his filing grievances. The response from the Defendant Eagleton to this grievance is as follows:

> I have reviewed your grievance and pertinent documentation. I was unable to verify any misconduct on behalf of any SCDC employee, nor have you presented any evidence to support your allegations after requesting. According to the memorandum, dated June 16, 2011, inmate correspondence privileges, you are considered an indigent inmate and legal supplies will be issued once a month. I have determined that you received legal material on 9/26/11, 10/21/11, 11/30/11, 12/19/11, and 1/06/12. I consider this matter resolved.

See also Plaintiff's Exhibit J-3 (Step 2 Grievance Response). None of these exhibits shows a violation of Plaintiff's right of access to the courts. See also, Alexander, 297 Fed. Appx. at n. 3 ["It goes without saying that prison grievances are not evidence of the allegations they contain."].

Plaintiff has also submitted a copy of a Request to Staff Member form (Plaintiff's Exhibit F-64) wherein he states that he has "reason to believe" that the passage of his legal mail has been "obstructed", along with the statement that he has "evidence" that something he mailed to the South Carolina Court of Appeals was obstructed. However, the response to the Request to Staff Member (from the Defendant Leggins) states:

> "I cannot substantiate your claim. In your request you advised that you have successfully retrieved evidence but nothing was provided to show proof of these allegations. I am going to refer this issue back to Lee and Evans CI. The restitution screen is also showing something different than your allegations (legal mail and legal supplies issued).



Again, there is nothing in this exhibit showing a violation of Plaintiff's constitutional rights. In yet another one of Plaintiff's exhibits (Plaintiff's Exhibit F-74), an attorney who is representing the Plaintiff relating to some warrants wrote the Defendant Dean at LCI stating that Plaintiff had contacted him to express concerns over his inability to send outgoing mail, and asking Associate Warden Dean to please ensure that Plaintiff is given access to the mail room. Again, however, this document is not "evidence" that any violation of Plaintiff's constitutional rights was occurring.

In sum, none of Plaintiff's exhibits show that he has been prejudiced in a pending legal case, and therefore he has failed to provide evidence sufficient to give rise to a genuine issue of fact that his constitutional right of access to the courts has been denied. Johnson v. Reno Police Chief, 718 F.Supp. 36, 38 (D.Nd. 1989)["Even a pro se plaintiff may not rely wholly on conclusory allegations, but rather must allege facts which, if proven would entitle the plaintiff to relief"]; Hause v. Vaught, 993 F.2d 1079, 1084-1085 (4th Cir. 1993). This claim is therefore without merit. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) [Dismissal of access to court claim proper where inmate relied on conclusory allegations and failed to identify any actual injury]; see Lewis v. Casey, 518 U.S. 343, 349-353 (1996)[Inmate alleging denial of access to the courts must be able to demonstrate "actual injury" caused by the policy or procedure at issue].

Nor has Plaintiff presented any evidence to show that his mail was improperly tampered with or "obstructed". Again reviewing Plaintiff's exhibits, his Exhibit J-2 is apparently the envelope that was returned to him because he had not put his room cell number on the return address. This document confirms that it does not show Plaintiff's cell number on the return address. See also Plaintiff's Exhibit J-19. Plaintiff has also submitted some documents showing withdrawal of money from his E. H. Cooper trust account for postage, but there is no indication of any improper activity

27

or conduct shown in these documents. Plaintiff's Exhibit J-5 is a memorandum to the Plaintiff from the Defendant Leggins about "Mail Room Questions" dated March 22, 2012. This memorandum cites Section 9 of SCDC Policy PS-10.08, Inmate Correspondence Privileges, noting that inmates may receive single copies of publications from a publisher or publication supplier, to include books, if paid for in advance by the inmate or by a family member or friend, except that inmates in the SMU may not receive any publication while in the SMU. This memorandum further advised Plaintiff that, while the jail house lawyers manual Plaintiff wanted to receive had otherwise been approved for receipt by inmates by the Correspondence Review Committee, again Plaintiff's "lockup" status prevented him from receiving *any* incoming publications. Rather, inmates in the SMU (where Plaintiff was housed) are allowed one book or magazine (in addition to primary religious materials) from library services only, with the inmate being required to turn in that book or magazine before they can receive a new book or magazine. In another one of Plaintiff's exhibits (Plaintiff's Exhibit J-18), Plaintiff complains that he is not being allowed receipt of legal materials consisting of crime scene photos. Plaintiff is advised in response to his grievance concerning this matter that crime scene photos are restricted and would therefore be placed in Plaintiff's inmate record. See also Plaintiff's Exhibit J-15. Plaintiff is also advised that he can obtain those items upon being released, and that there was also a process in place that allows inmates to request access to this material.

Plaintiff's complaint that, as an SMU inmate, he is not allowed to possess such items as crime scene photographs or a mailed-in legal publication does not establish a constitutional violation. Hinojos v. Byars, No. 13-1900, 2014 WL 3687400 at **2, 7 (D.S.C. July 23, 2014) ["The SCDC policy denying publications to SMU inmates has been held to be rationally related to legitimate and neutral government objectives."] (citing Koon v. Ozmint, No. 06-2000, 2007 WSL

28

1486067 at ** 3-5 (D.S.C. 2007) [Finding policy creates an incentive or motivation for SMU inmates to change their behavior, reduces a potential fire hazard in the SMU, reduces the places an SMU inmate can hide drugs and weapons, and deters improper uses of books, magazines, and newspapers to cover cell windows to conceal activity within their cells, jam the locks to prevent entry into their cell, and stop up toilets]; see also Mohammad v. Beard, No. 05-580, 2007 WL 1439051, at * 6-7 (W.D.Pa. May 16, 2007) [Discussing application of Turner[18] standards to prisoner property privileges in the SMU]; Perry v. Cartledge, No. 13-1656, 2014 WL 4700885, at * 10 (D.S.C. Sept. 19, 2014).

This Court can take judicial notice from its many previous cases involving inmates in the South Carolina Department of Corrections system that SMU inmates are higher custody inmates who are in an even more controlled environment than general population inmates. Aloe Creme Laboratories, Inc., 425 F.2d at 1296 [a federal court may take judicial notice of the contents of its own records]. A higher level of restriction is routinely placed on such inmates, and no constitutional claim has been demonstrated in the evidence that has been presented to this Court. See Ramirez v. McCaughtry, No. 04-335, 2005 WL 2010173 (W.D.Wisc. 2005) [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part of an incentive system for good behavior]; Leyra v. Neven, No. 10-84, 2010 WL 4604662 at * 2 (D.Nev. 2010) [Dismissing Plaintiff's claims for violation of Fourth, Sixth, Eighth, and Fourteenth Amendments where Plaintiff alleged that prison officials wrongfully confiscated and permanently deprived him of crime scene photographs]; In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their

---

[18]Turner v. Safley, 482 U.S. 78 (1987).

29

judgment are needed to preserve internal order and discipline and to maintain institutional security'"]
(quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979)); <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003)
["We must accord substantial deference to the professional judgment of prison administrators, who
bear significant responsibility for defining the legitimate goals of a corrections system and for
determining the most appropriate means to accomplish them"]; <u>see also Anderson v. County of Kern</u>,
45 F.3d 1310, 1316 (9th Cir. 1995) [Prison officials have legitimate penological interests in
Administrative Segregation, and they must be given "wide-ranging deference" with respect to their
need to maintain order, discipline, and "institutional security"], <u>reh'd denied</u>, 75 F.3d 448 (9th Cir.
1995), <u>cert. denied</u>, <u>County of Kern v. Anderson</u>, 116 S.Ct. 306 (1995); <u>Rish v. Johnson</u>, 131 F.3d
1092, 1096 (4th Cir. 1997) ["only extreme deprivations are adequate to satisfy the objective
component of an Eighth Amendment claim regarding conditions of confinement"]; <u>Alberti v.
Klevenhagen</u>, 790 F.2d 1220, 1228 (5th Cir. 1986) [Eighth Amendment does not require "the
provision of every amenity needed to avoid mental, physical, or emotional deterioration."].

  In any event, Plaintiff's other exhibits reflect that his complaints concerning his
mailings were routinely being addressed, and fail to establish any constitutional violation by any
named Defendant. <u>See</u> Plaintiff's Exhibits F-85, F-86, F-96, F-98, J-2, J-3, J-4, J-10, J-11, J-13, J-14,
J-33. This claim is therefore without merit.

V.

  In order to proceed with his claim for denial of medical care as a constitutional
violation, Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether any
named Defendant was deliberately indifferent to his serious medical needs. <u>Estelle v. Gamble</u>, 429
U.S. 97, 106 (1976); <u>Farmer v. Brennen</u>, 511 U.S. 825, 837 (1994); <u>Sosebee v. Murphy</u>, 797 F.2d 179



30

(4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence.

Plaintiff alleges in his Complaint that after the incident on March 28, 2012, where the Defendant Martin allegedly "slammed" his right pinky finger in the cell door flap, he was not given any pain medication "because the staff claimed they were out" even though he was experiencing "intense pain". Plaintiff also alleges that when he showed his swollen finger to the Defendant Nurse McQueen,[19] she simply told him to sign up for sick call. Plaintiff further alleges that when he showed his finger to a "Nurse Tyler" the following day, she told the Defendant Sergeant Sims to bring Plaintiff to medical, but that "Sims ignored the nurse". However, Plaintiff has also submitted an exhibit (Plaintiff's Exhibit F-9) showing that he was seen in the medical department by Nurse Tyler on April 3, 2012 complaining about pain in his right pinky finger after it had been "slammed in flap", that his finger was noted to be very swollen, he was given a "buddy tape metal splint" to wear for four weeks, Motrin for pain, and that an x-ray was ordered. The x-ray revealed no evidence of osseous injury, stating: "Soft tissue swelling overlies the distal phalanx. No fractures were identified. Joint spaces are intact with normal alignment. A dorsal osteophyte projects off the base of the distal phalanx". See Plaintiff's Exhibit F-12. Plaintiff's own exhibits reflect that he also received a followup x-ray on August 9, 2012, which was unremarkable. See Plaintiff's Exhibit F-11. Specifically, this x-ray found as follows: "Soft tissues are unremarkable. A mild deformity of the

---

[19]There is no evidence that McQueen has ever been served with process in this case, notwithstanding Plaintiff having been provided with several opportunities to provide service papers for this Defendant. See Court Docket Nos. 59, 78. As such, McQueen would be entitled to dismissal as a party Defendant even if Plaintiff had otherwise set forth a valid claim against this Defendant. See Rule 4, Fed.R.Civ.P.

distal fifth metacarpal is present consistent with an old healed fracture. No acute fractures are identified. Joint spaces are intact with normal alignment". See Plaintiff's Exhibit F-10. The Defendants have also submitted this same medical evidence as part of their exhibits, as well as evidence of additional medical consultations. See Defendants Exhibit 8 (Medical Records). Defendants' medical records reflect that (in addition to numerous other medical consultations Plaintiff was receiving for other complaints during the relevant time period), he was seen for a followup on his right finger injury on May 17, 2012, apparently by the physician (Dr. Paul Drago). This medical entry indicates that Dr. Drago went over the results of the x-ray with the Plaintiff, and that Plaintiff was "not happy" because the x-ray did not show any fractures.

With respect to the medical care Plaintiff received after he alleges he was assaulted by another inmate on April 18, 2012, Plaintiff's medical records reflect that he was seen in medical that same day, where it was noted that he had a three centimeter by one centimeter wound on the back of his head, that Plaintiff was offered steri-strips but asked if could instead just have a band-aid, and that the area was cleansed by medical personnel (Nurse Perry) and a band-aid was affixed to the area after Neosporin was applied. It was also noted that Plaintiff had no complaints of pain, with the wound to be addressed daily until healed. None of Plaintiff's medical encounter notes over the following weeks reference any problem relating to this injury. See generally, Defendants' Exhibit 8 (Medical Records).

Plaintiff's only other specific complaint about his medical care (other than his general and conclusory comments about receiving "improper" mental health care) relates to an eye infection. Plaintiff has submitted an exhibit (Plaintiff's Exhibit F-31) evidencing that he was seen in medical on April 6, 2014 complaining that his eye had started draining about three days previous but that he

had apparently not come to medical because he thought it would get better. Plaintiff was noted to have an infection or "conjuctivia". Defendants' exhibits show that after Plaintiff complained to a correctional officer on April 6, 2014 of drainage coming out of his eye, the officer was advised to send Plaintiff to medical, that he was thereafter seen in medical, and provided medication and treatment, with an indication that his condition would be reassessed in seventy-two hours. When Plaintiff returned to medical on April 11, 2014,[20] his eye was noted to have "clear drainage". Plaintiff's medical records reflect that he thereafter continued to be seen for treatment of his eye at regular intervals (as well as being seen for various other complaints). See generally, Defendants' Exhibit 8 (Medical Records).

    In sum, the medical records provided to this Court by the Defendants as well as Plaintiff's own exhibits show that Plaintiff received regular and ongoing medical care and treatment for a variety of medical complaints and conditions during the relevant time period. There is nothing in these medical records to show that any Defendant was being deliberately indifferent to Plaintiff's serious medical needs. Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837. Plaintiff's mere lay disagreement with the opinions, diagnoses or treatments provided by the medical professionals, without any contrary *medical* evidence to show that any medical professional violated the requisite standard of care for his complaints, is not sufficient to maintain a §1983 deliberate indifference lawsuit. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim

---

[20]He was also seen in medical several times in the interim for other medical complaints and issues.

33

absent exceptional circumstances]; Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006)

(citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to

determine...medical fitness, whether physical or mental; that is what independent medical experts are

for."]).

        While Plaintiff may not agree with the extent and nature of the medical care he

received, he cannot simply allege in a conclusory fashion that he did not receive constitutionally

adequate medical care or attention, otherwise provide no supporting evidence, and expect to survive

summary judgment, particularly when the Defendants have submitted medical documents and

evidence showing that Plaintiff was regularly seen and evaluated by medical personnel for his

complaints and which refute Plaintiff's claims.  Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir.

2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence

insufficient to defeat summary judgment on deliberate indifference claim]; Morgan v. Church's Fried

Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent

pleading standards than attorneys the court is not required to 'accept as true legal conclusions or

unwarranted factual inferences.'"]; Levy, 1997 WL 112833 ["A defendant acts with deliberate

indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or

safety.'"].  Even if the evidence before the Court showed that some named Defendant may have been

negligent with respect to the care provided to the Plaintiff (which the undersigned has not found), that

would not be enough for Plaintiff to maintain this claim.  Estelle, 429 U.S. at 106 ["medical

malpractice does not become a constitutional violation merely because the victim is a prisoner."].

        Therefore, as the evidence before the Court is insufficient to create a genuine issue of

fact as to whether any named Defendant was deliberately indifferent to Plaintiff's serious medical



34

needs, the standard for a constitutional claim, Plaintiff's federal § 1983 medical claim should be dismissed.

## VI.

Plaintiff's allegations concerning the conditions of his confinement are essentially a hodgepodge of varying conclusory claims and allegations, none of which are supported by evidence sufficient to allow this claim to proceed. During the time period at issue, Plaintiff was a prisoner being held in the SMU (heightened security) section of a state prison, not a hotel. It is to be expected that conditions of confinement under such circumstances are often times less than ideal. Hadley v. Peters, No. 94-1207, 1995 WL 675990 at *8 (7th Cir. 1995), cert. denied, 116 S.Ct. 1333 (1996) ["prisons are not required to provide and prisoners cannot expect the services of a good hotel."] (quoting Harris v. Fleming, 839 F.2d at 1232, 1235 (7th Cir. 1988). Therefore, the only issue for this Court to decide is whether the evidence presents a sufficient question of fact that the conditions under which Plaintiff was confined violated his constitutional right to be free from conditions so deplorable that they could be deemed cruel and unusual punishment. Plaintiff has failed to submit any such evidence.

Plaintiff's most serious allegation would appear to be a "failure to protect" claim, in that he alleges that the SMU has "broken security doors" and that the SMU is unreasonably dangerous, conditions of which the Defendants Eagleton and Ward had knowledge and failed to take any corrective action. Plaintiff also alleges that the Defendants Eagleton, Martin and Sims attempted to "cover up the incident" where he was attacked by another inmate on April 18, 2012 because they "failed to see the foreseeability of the broken security locking mechanism". Finally, Plaintiff alleges that the Defendant Eagleton intentionally housed him with a dangerous inmate, Charles Hayes,



35

resulting in his being attacked by Hayes on December 6, 2012, and that even though he filed a grievance over this incident, Hayes remained housed in the same dorm as the Plaintiff, resulting in Plaintiff having to pay money on March 11, 2013 to keep Hayes and others from stabbing him.

In order to proceed on a failure to protect claim, the evidence must be sufficient to give rise to a genuine issue of fact as to whether any named Defendant was deliberately indifferent to a specific known risk of harm to the Plaintiff. See Pruitt v. Moore, No. 02-395, 2003 WL 23851094, at * 9 (D.S.C. Jul. 7, 2003)[Deliberate or callous indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim], cert. denied, 2004 WL 232748 (4th Cir. 2004); Levy, 1997 WL 112833 ["A defendant acts with deliberate indifference . . . if he or she 'knows of and disregards' an excessive risk to inmate health or safety]. Pursuant to this standard, the Defendant against whom the claim is being asserted "must have both been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and . . . must have also drawn that inference". Farmer v. Brennan, 511 U.S. 825, 837 (1994). The Supreme Court has held that a plaintiff can make out a prima facie case of deliberate indifference by showing "that a substantial risk of [serious harm] was long standing, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it". Farmer, 511 U. S. at 842. However, this "deliberate indifference" standard is a "very high standard - a showing of mere negligence will not meet it". Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999); see also A.P. ex rel. Bazerman v. Feaver, No. 04-15645, 2008 WL 3870697 at *12 (11th Cir. Aug. 21, 2008)["[D]eliberate indifference requires a much higher standard of fault than mere or even gross negligence . . . ."], Danser v. Stanberry, 777 F.3d 340, 346-347 (4th Cir. 2014)[Plaintiff must

36

"establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" and "that the prison official allegedly violating [P]laintiff's constitutional rights had a sufficiently culpable state of mind"] (internal citation omitted) [vacating district court's order denying summary judgment and remanding with instructions to enter summary judgment].

Plaintiff has failed to present any evidence to show that the Defendant Sims or any other Defendant had any knowledge that he was subject to being attacked by another inmate on April 18, 2012. Indeed, it does not even appear that Sims was present at the time the attack took place, only arriving on the scene subsequently along with Officer Quick. Plaintiff has presented no evidence to show that Sims was aware that a substantial risk of Plaintiff being attacked by this other inmate existed prior to this event, nor has he provided any evidence to show that the Defendants Eagleton, Martin or Sims "cover[ed] up the incident" because they "failed to see the foreseeability of the broken security locking mechanism". House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]; Nat'l Enters., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000)[Holding that a self-serving affidavit was insufficient to survive summary judgment]. While Plaintiff complains that the SMU is a dangerous place where inmate on inmate attacks occur, it is simply a truism that state prisons, and in particular the maximum security sections of such prisons, are dangerous places. Even so, Plaintiff has provided no evidence to show that any named Defendant had been exposed to any information, or had any knowledge to put them on notice, that Plaintiff was subject to being attacked by this other inmate. Cf. Parrish v. ex rel. Lee v. Cleveland, 372 F.3d 294, 302-303 (4th Cir. 2004)[Situation must be evaluated as the officers reasonably perceived it, "not as it now may be perceived enlightened by the benefit of hindsight"]; Morgan, 829 F.2d at 12 ["Even though pro se litigants are held to less stringent pleading standards



than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; <u>Drayton v. Cohen</u>, No. 10-3171, 2012 WL 666839 at * 7 (D.S.C. Feb. 29, 2012) [granting summary judgment on a failure to protect claim], <u>aff'd</u>, 474 Fed.App'x. 991 (4th cir. Aug. 6, 2012); <u>Carter v. Galloway</u>, 32 F.3d 1346, 1349-1350 (11th Cir. 2003) [Affirming summary judgment where Defendants knew that inmate who attacked Plaintiff was a problem inmate with a disobedience history and had been prone to violence, but Plaintiff failed to establish the Defendants had a subjective awareness of a substantial risk of serious physical threat to the Plaintiff].

The same must be said about Plaintiff's allegation concerning the attack on him by Inmate Hayes on December 6, 2012.[21] Plaintiff's exhibits include a Request to Staff Member form dated January 16, 2013 (Plaintiff's Exhibit F-80), wherein Plaintiff stated that he had asked to be placed in protective custody as far back as early 2012, and that he was in "constant fear of my safety", citing to the two incidents where he had been attacked the previous year by inmates Hayes (on December 6, 2012) and Quentin McCall (the inmate who attacked Plaintiff on April 18, 2012). Plaintiff further states in this Request to Staff Member form that Hayes was continuing to threaten him. In a response dated February 6, 2013, Eagleton informed the Plaintiff that he would be scheduled for evaluation for protective custody, following which the interviewing officials would recommend appropriate action. Eagleton also asked Plaintiff for the names of the "gangster disciples" who Plaintiff was claiming were present in the SMU, and whether Plaintiff had any witnesses to their conduct. In a grievance dated January 29, 2013 (Plaintiff's Exhibit F-56) Plaintiff complains that his Request to Staff form had not been responded to (as noted above, Eagleton

---

[21]While the evidence reflects that Plaintiff had earlier expressed concern for his safety, his alleged need for protection was due to two officers who were going to allegedly have him attacked. <u>See</u> Plaintiff's Exhibit 46. He has presented no evidence that the attack on December 6, 2012 was related to any officer's conduct.



responded on February 6, 2013), and that he was concerned for his safety. Eagleton responded to this grievance as follows:

> I have reviewed your grievance and the facts. I was unable to verify that you wrote a Request a Staff to A/W Sellers. However, I did respond to the Request to Staff you wrote me. I returned it to you 2/6/13. I was unable to substantiate your allegation of being threaten[ed] from the information you provided. You gave no names, no witnesses, and from your statement, the inmate you alleged threaten[ed] you was unsuccessful in removing his restraints.[22] After carefully reviewing your disciplinary history, it appeared you were the aggressor while assigned to Evans CI. On 3/27/13, you were transferred to Lee CI. This should have resolved your safety concerns. I consider this matter resolved.

In a grievance dated March 10, 2013 (Plaintiff's Exhibit J-30), Plaintiff complains that on March 2, 2013 while at ECI, "two unidentified inmates who had towels over their heads were trying to break into my cell and attack me". In response to this grievance, Eagleton wrote as follows:

> I have reviewed your grievance and the facts. I was unable to verify that two (2) unidentified inmates attempted to break into your cell and you did not present any evidence to support your allegations. None of the staff you mentioned recalled you informing them of this incident. You are no longer assigned to Evans Correctional Institution, and you did not provide enough information for corrective measures to be considered. Based upon the information provided, your grievance is denied.

None of this evidence is sufficient to create a genuine issue of fact that any named Defendant had knowledge of facts from which the inference could be drawn that a substantial risk of serious harm existed to the Plaintiff, and deliberately disregarded that risk. Alexander, 297 Fed.Appx. at 105 n. 3 ["It goes without saying that prison grievances are not evidence of the allegations they contain."]. In particular, Plaintiff has provided no evidence to show that any named Defendant had any advance knowledge that he was going to be attacked by either Hayes or McCall prior to those attacks taking place, nor has he provided any evidence to support the unsubstantiated

---

[22]Plaintiff's Request to Staff form stated that on January 9, 2013 a "gangster disciple" had tried to get out of his handcuffs, but was unable to do so. See Plaintiff's Exhibit F-80.



allegations of his complaint, to show that he has been subjected to any additional attacks, or that any Defendant has been deliberately indifferent to a known excessive risk to his health or safety. Levy, 1997 WL 112833 (N.D.Ill. Mar. 11, 1997)["A defendant acts with deliberate indifference . . . if he or she 'knows of and disregards' an excessive risk to inmate health or safety]; Farmer, 511 U.S. at 837[Defendant must have both been aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also have drawn that inference"].

As for the remainder of Plaintiff's condition of confinement claims, including that his cell is "filthy" and needed to be disinfected, that the Defendant Sims made him take down a "cloth line" that he had made to hang his laundry, that there are insufficient lockers or storage space or tables to write on, that his cell block at LCI violated "building codes" and DEHC regulations, and similar complaints, these claims are so general and conclusory, lacking in specificity or detail, and unsupported by any documentary or affidavit evidence to allow these claims to proceed. See generally Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) ["[O]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"]; Farmer, 511 U.S. at 834-835 [noting that nothing in the evidence presented to the court showed that plaintiff was ever denied the minimal civilized measure of life's necessities, or that any defendant engaged in conduct "for the very purpose of causing harm or with the knowledge that harm [would] result"]; cf. Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1977)[accepting Plaintiff's allegations for purposes of summary judgment that cells were unbearably hot, infested with vermin, smeared with human feces and urine, flooded with water from a leaky toilet above, and where food provided was cold and provided in smaller portions, but holding that such conditions were not "so



atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life."].

Finally, by reaching the conclusion that no compensable constitutional violation has been shown in the evidence, the undersigned does not intend to signal a lack of concern over Plaintiff's complaints. However, while Plaintiff may have some state law claim or administrative process he could pursue, absent some evidence of a significant injury suffered by the Plaintiff as a result of conditions deemed to be unconstitutional, or other accompanying factors not present in this case, the undersigned does not find that Plaintiff has presented a genuine issue of fact as to whether his constitutional rights were violated due to the conditions of his confinement sufficient to survive summary judgment. Danser, 772 F.3d at 346-347 [requiring showing of significant injury]; Witherspoon v. Berry, No. 13-2942, 2015 WL 1790222 (D.S.C. April 15, 2015) [conditions of confinement claim requires showing of significant injury]; Holley v. Johnson, No. 08-629, 2010 WL 2640328 at * * 9-15 (W.D.Va. June 30, 2010)[noting that while excessive force claim does not require showing of a significant injury, condition of confinement claim does]; see DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; see Paul v. Davis, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right].

## VII

Plaintiff's final claim is for excessive use of force. When reviewing an excessive force claim, the Court should consider 1) the need for the application of force, 2) the relationship



between the need and the amount of force that was used,  3) the threat to the staff and inmates as reasonably perceived by the prison officials on the basis of the facts known to them,  4) the efforts made to temper the severity of a forceful response, and 5) the extent of the injuries suffered by the prisoner.  Whitley v. Albers, 475 U.S. 312, 321 (1986); Hill v. Crum, 727 F.3d 312, 327 (4th Cir. 2013); see Mann v. Failey, 578 Fed.Appx. 267, 273 (4th Cir. July 17, 2014); Majette v. GEO Group, Inc., No. 07-591, 2010 WL 3743364, at * 6 (E.D.Va. Sept 22, 2010); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992) [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; Mann, 578 Fed.Appx. 273 [In order to prevail on an Eighth Amendment excessive force claim, Plaintiff must show both that the deprivation suffered or injury inflicted was sufficiently serious, and that the prison official acted with a sufficiently culpable state of mind], citing Williams v. Benjamin, 77 F.3 756, 761 (4th Cir. 1996).[23]

Plaintiff sets forth three instances where he alleges excessive force was used against him, one of which was when the Defendant Martin closed the food service flap on his cell door on his right pinky finger.  However, the injury to Plaintiff's pinky finger, which did not even result in a fracture, was not "sufficiently serious" under the facts presented to give rise to a claim under the United States Constitution.  Mann, 578 Fed. Appx. at 273 [Plaintiff must show that deprivation suffered was sufficiently serious]; Grissom v. Roberts, No. 09-3128, 2009 WL 2601260 at * 6 (D.Kan. Aug. 24, 2009) ["Not every isolated battery or injury to an inmate amounts to a federal

---

[23]In a recent case, the United States Supreme Court held that a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim.  The Supreme Court did not, however, extend that holding to cases involving convicted prisoners, such as the Plaintiff here.  See generally, Kingsley v. Hendrickson, ____ S.Ct. ____, 2015 WL 2473447, at * 7-11 (June 22, 2015).

42

constitutional violation"]. Although it is not required that Plaintiff show he suffered more than a <u>de minimis</u> injury to maintain an excessive force claim; <u>see</u> <u>Wilkins v. Gaddy</u>, 130 S.Ct. 1175, 1179-1180 (2010)[Noting that the notion that significant injury is a threshold requirement for stating an excessive force claim was rejected in <u>Hudson</u>, 503 U.S. at 7]; <u>cf.</u> <u>Bacon v. Wood</u>, ___ Fed. Appx. ___, 2015 WL 3973946, at * 2, n. 2 (4th Cir. July7 1, 2015); the extent of any injury suffered by an inmate remains one of the factors to be considered under <u>Whitley</u> in evaluating an excessive force claim, and the "absence of [a] serious injury" remains relevant in an Eighth Amendment inquiry. <u>Wilkins</u>, 130 S.Ct. at 1179-1180 [holding that the extent of injury may provide some indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"], citing to <u>Hudson</u>, 503 U.S. at 9 (quoting <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)); <u>see</u> <u>also</u> <u>Ellerbe v. Roach</u>, No. 08-3118, 2010 WL 3361703, at * 3 (E.D.N.C. Aug 24, 2010). Plaintiff has simply failed to produce any evidence sufficient to set out a claim of a constitutional magnitude as a result of this incident.[24] <u>Bell v. Wolfish</u>, 441 U.S. 520, 540 (1979) ["[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action"]; <u>see also</u> <u>Grissom</u>, 2009 WL 2601260 at * 6 ["Not every isolated battery or injury to an inmate amounts to a federal constitutional violation"]; <u>House</u>, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim].

Plaintiff also alleges in his Complaint that on December 21, 2011, a "rapid response team" consisting of the Defendant Martin and others conducted a search of his cell, during which

---

[24]Notably, Plaintiff's assertion in his affidavit that his finger was "and still is" dislocated is belied by the actual medical records which are in evidence in this case. <u>King v. Flinn & Dreffein Eng'g Co.</u>, No. 09-410, 2012 WL 3133677, at * 10 (W.D.Va. July 30, 2012)[Finding no genuine issue of material fact where only evidence was "uncorroborated and self-serving testimony"], citing <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002).



Plaintiff alleges in his Complaint that he and Martin got into a "heated argument" over his property resulting in Martin spraying him "in the genital area". In his affidavit, however, Plaintiff states that he was "gassed" for making a verbal threat to file a grievance. Significantly, other than this one comment, no other information regarding this incident is provided by Plaintiff in his affidavit. In his brief, Plaintiff cites to the affidavits from Scarborough, Hemingway and Mullinex as providing support for this claim; however, none of these affidavits reference this incident. <u>See</u> <u>generally</u>, Plaintiff's Exhibits F-19, F-37, F38.

Plaintiff also cites to some additional exhibits he contends support this claim (specifically, Plaintiff's Exhibits F-1, F-4, F-5, F-6, F-7, F-14, F-18). <u>See</u> <u>Plaintiff's Brief</u>, pp. 2-8. Exhibit F-1 is a copy of the Incident Report from this incident, which reflects that on December 21, 2011, the rapid response team on duty in the SMU was conducting security shakedowns, during which the Plaintiff "refused to stay seated while the shakedowns was being conducted . . . .". This exhibit further reflects that Plaintiff was then placed in another cell until the shakedown was finished, during which he was making "verbal threats towards staff", cursing at them and saying that he "got something" for them. The Incident Report reflects that Plaintiff was given several directives to cease his verbal threats towards staff, but that he refused to comply and continued with his verbal threats, at which time the Defendant Martin "administered one burst of sabre red fogger into the cell to cease [Plaintiff's] action, he complied, seen by medical and will be charged with refusing to obey orders and threatening to inflict harms". A separate exhibit attached to Martin's affidavit shows that 34.4 grams of sabre red fogger was used.

Plaintiff's purported Exhibit F-4 was not contained in the materials provided to the Court, but according to Plaintiff's Brief was apparently intended to be another copy of the Incident



44

Report. Plaintiff's Exhibit F-5 is a copy of a Medical Summary Note which does not contain any information about this incident. Plaintiff has two (2) Exhibits F-7, the first of which is a copy of a Mental Health Services sheet which also does not appear to have any information on it relating to this incident. Plaintiff's second Exhibit F-7 is a copy of Plaintiff's medical record relating to this incident, which has also been submitted by the Defendant Martin and (as is discussed below) does not support his claim. Finally, Plaintiff's Exhibits F-6, F-14 and F-18 also do not appear to contain any information relating to this incident.[25]

For his part, Martin attests in his affidavit that he only administered one burst of sabre red fogger into Plaintiff's cell in a good faith effort to reasonably maintain and/or restore discipline and to get Plaintiff to comply with his commands after he refused to comply and continued making verbal threats to staff members. Martin further attests that the "limited application" of chemical munitions in this case was only in an amount necessary to gain Plaintiff's compliance and was commensurate with the gravity of the occasion, that his use of chemical munitions in this case was "much more humane and effective than a flesh to flesh to confrontation" with the Plaintiff would have been, and that the minimal amount of force used is confirmed by Plaintiff's medical records (attached as Exhibit C to his affidavit) which show that following this incident Plaintiff was in no

---

[25]Although not referenced by Plaintiff in his brief, an independent review of Plaintiff's exhibits by the undersigned reveals that his Exhibit F-15 also apparently relates to this incident. This exhibit is a Step 2 grievance appeal wherein Plaintiff complains not only about being sprayed with the fogger, but that he suffered a chipped tooth when he was punched in the face. As previously noted, however, this exhibit is not "evidence" to support Plaintiff's excessive force claim. Cf. Ball, _____ F.3d _____, 2015 WL 4114473 at * 6 ["Because grievances are essentially pleadings, not evidence, they must have independent verification before they become probative."]; Alexander, 297 Fed.Appx. at 105 n. 3 ["It goes without saying that prison grievances are not evidence of the allegations they contain."]. Plaintiff also mentions nothing about his being struck or having a tooth chipped during this encounter in his affidavit, nor do the medical records relating to this incident contain any evidence to support these allegations. See Plaintiff's Exhibit 58; Defendants' Exhibit C [Medical records attached to Martin Affidavit].

respiratory distress and was experiencing no rash, hives, or scratching as a result of this incident. This medical record also reflects that Plaintiff requested to be allowed to take a shower, and that he was given permission to do so. See Martin Affidavit, attached Exhibit C; see also Defendants' Exhibit 8 (Medical Records).

After careful review and consideration of Plaintiff's allegations juxtaposed with the evidence submitted regarding this claim, the undersigned concludes that the Defendant Martin (the only named Defendant against whom this claim is directed) is entitled to summary judgment. It is an unfortunate fact that when prison inmates are non-compliant with legitimate instructions and prison requirements, some type of physical force sometimes has to be applied in order to gain compliance and maintain institutional security, the security of prison employees, as well as the inmates themselves. It is only when the force used under such circumstances is constitutionally excessive that a viable § 1983 claim is presented, and the use of mace or pepper spray by prison officials is not a violation of a prisoner's constitutional rights when used appropriately. Williams, 77 F.3d 763; Peterson v. Davis, 551 F.Supp. 137 (D.Md. 1982), aff'd without op., 729 F.2d 1453 (4th Cir. 1984); Williams v. Dehay, Nos. 94-7114, 94-7115, 1996 WL 128422 **2-3 (4th Cir. March 21, 1996). Indeed, chemical sprays are generally used in order to *avoid* having to use direct physical force, or in an attempt to lessen the amount of physical force necessary, which is how the evidence shows the chemical spray was used in this incident. cf. Whitmore v. Walker, No. 04-837, 2009 WL 900034 at * 9 (S.D.Ill. Mar. 27, 2009) ["[E]ighth Amendment does not require prison guards to engage in physical struggle with an inmate before using chemical mace. Indeed, part of the rationale for using mace is to allow the guards to avoid engaging in physical altercations with an inmate."].



46

Prisons are dangerous places, and prison officials are entitled to take necessary precautions to protect themselves from risk of harm and injury at the hands of inmates, in particular high security inmates. Here, the evidence shows that a minimal amount of chemical agent was used in an attempt to obtain compliance from the Plaintiff in the first instance so that no physical force would have to be used, which of course was ultimately the case. See Grissom, 2009 WL 2601260 at * 6 [Finding that under the circumstances, which included Plaintiff refusing to obey orders, Plaintiff failed to show that the use of physical force including pepper spray was repugnant to the conscience of mankind]; cf. Plummer v. Goodwin, No. 07-2741, 2010 WL 419927, at * 7, n. 4 (D.S.C. Jan. 29, 2010) [Noting that use of 33.50 grams of chemical munitions on the Plaintiff "would be considered a relatively small quantity and not constitutionally relevant"]. Although Plaintiff claims in his filings that he was being "compliant" with the officer's instructions, he also himself concedes in the allegations of his Complaint that he and Martin got into a "heated argument". Further, while Plaintiff alleged in his Complaint that inmates in the SMU are "not allow[ed] . . . to shower for days at a time because they claim the prisoner can use the sink to wash", he has provided no evidence to contradict the medical record entry that he was granted permission to shower following this incident.

Even considered in the light most favorable to the Plaintiff, the evidence before the Court is sufficient to justify a need for the application of force under the circumstances, and reflects that the minimal amount of fogger used was administered by Martin under the circumstances in order to diffuse the situation, gain Plaintiff's compliance, and minimize the risk of injury to both Plaintiff and the prison guards as a result of a physical confrontation brought about by Plaintiff's own conduct. Williams, 77 F.3d 761 [because prison officials are entitled to use appropriate force to quell prison



47

disturbances, and because these officials oftentimes must act under pressure without the luxury of a second chance, in order for a prisoner to prevail on an Eighth Amendment claim he must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm]. As further support for this finding, the undersigned is constrained to note that Plaintiff has also failed to present any evidence to show that he suffered any significant injury as a result of this incident. Wilkins, 130 S.Ct. at 1179-1180 [holding that while a significant injury is not a threshold requirement for stating an excessive force claim, the extent of injury may provide some indication of the amount of force applied, and that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"]. Plaintiff's self-serving statement that he was "compliant" and that there was no justification for the use of the fogger in this instance finds no support in the documentary evidence submitted. Honeywell Technology Solutions, Inc., 323 Fed.Appx. 276, 278, n. 4 (4th Cir. 2009)[Holding that Plaintiff's "self-serving contentions" that he was treated unfairly "were properly discounted by the district court as having no viable evidentiary support"]; see also Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995)[Explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be within the range of probability" and that "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary"(internal quotation marks omitted)].

Therefore, the evidence is not sufficient to create a genuine issue of fact that the amount of force that was used here exceeded the requirements necessary to gain control of the situation. See Whitley, 475 U.S. at 321 [discussing five factors to consider when evaluating an



48

excessive or claim]; <u>Bailey</u>, 736 F.2d at 969 [Courts must evaluate the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used [to] determin[e] the validity of the use . . . in the prison environment"]; <u>Hudson</u>, 503 U.S. at 7 [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; <u>Bell</u>, 441 U.S. at 540 ["[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action"]; <u>see</u> <u>also</u> <u>Johnson</u>, 481 F.2d at 1033 ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"]. While Plaintiff may conceivably have a state law claim he could assert arising from this incident, or some further administrative remedy he can pursue, the evidence before this Court is not sufficient to create a genuine issue of fact as to whether *constitutionally* excessive force was used under the circumstances in this case. <u>Grissom</u>, 2009 WL 2601260, * 6 ["Not every isolated battery or injury to an inmate amounts to a federal constitutional violation"]; <u>Whitley</u>, 475 U.S. at 321 [Conduct only actionable where evidence shows it was taken "in bad faith and for no legitimate purpose"]; <u>see</u> <u>Paul</u>, 424 U.S. at 701[not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right].

       Finally, Plaintiff also complains about the actions of Officer Quick on September 15, 2012. However, as previously noted, Officer Quick was not named as a party Defendant in the caption of the Complaint filed in this action, he has never been served with process in this case, and no responsive pleading has ever been filed on his behalf. While Plaintiff may have originally intended to include Quick as a Defendant in this case, that does not change the fact that Quick was



not listed as a Defendant when this case was filed.[26] Numerous court filings since the commencement of this action referenced who the named Defendants were, and even noted that Plaintiff had filed motions to amend which had not included any attempt to add Quick as a party Defendant in this case. See, Court Docket Nos. 1-1, p. 4; 37, 55. While Plaintiff did finally file a motion to amend that, inter alia, included adding Quick as a Defendant together with other sought after changes in his pleadings, that motion was denied by the undersigned on November 6, 2014 as being manifestly untimely and simply too late in the game. See Court Docket Nos. 65 and 73. Defense counsel does not represent Quick, and it would not be proper to add him as a party Defendant now and allow a claim to proceed against him at this late date. See also, Rule 4(m), Fed.R.Civ.P. [requiring service of the summons and complaint on a defendant within four months of the commencement of an action].

Therefore, as Quick is the only individual referenced with respect to the incident of September 15, 2012, with none of the named Defendants in this case being parties to that event, any claims Plaintiff is asserting with respect to that incident are subject to summary judgment.

### Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

July 15, 2015
Charleston, South Carolina

Bristow Marchant
United States Magistrate Judge

---

[26]This omission is no doubt attributable to Plaintiff trying to pursue numerous separate and disparate claims over a range of years against various Defendants who otherwise have no connection to each other, all in one lawsuit. See also Court Docket No. 55.

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

